**PEERLESS EQUIPMENT CO. v. W. H. MINER, Inc. ***

No. 6304.

Circuit Court of Appeals, Seventh Circuit.

Nov. 23, 1937.

Rehearing Denied Jan. 6, 1938.

*Writ of certiorari denied 58 S.Ct. 611, 82 L.Ed. ——.

. Otto Raymond Barnett and George L. Wilkinson, both of Chicago, Ill., and Rodney Bedell, of St. Louis, Mo., for appellant.

George I. Haight, Henry Fuchs, and Edward A. Haight, all of Chicago, Ill., for appellee.

Before SPARKS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

SPARKS, Circuit Judge.

This action sought injunctive relief and an accounting for alleged infringement of United States patents to Brenne, No. 1,555,628, and to Johnson, No. 1,730,214. The former was issued September 29, 1925, on an application filed November 2, 1922; the latter was issued October 1, 1929, on an application filed October 25, 1923. Continuously since their issuance appellee has owned all right, title and interest in both patents. They relate to draft gears for railway cars. A draft gear is a device for cushioning certain shocks of train operation, more particularly those incident to the coupling of cars. Its purpose is to furnish a yielding connection between the coupler and the car frame, and it acts as a shock absorber.

Two of appellant's devices were charged with infringement of both patents, and appellant denied validity and infringe-ment as to each. The court found both patents valid; that claim one of the Brenne patent was infringed by appellant's first device only, and that all five claims of the Johnson patent were infringed by both of appellant's devices. Injunction and accounting were awarded and supersedeas accompanied the granting of this appeal.

In shock absorbing mechanisms employing a friction shell, a plurality of friction shoes arranged in a circular series within the shell, and a pressure transmitting member, it was the usual practice to make the shell as a casting without any machine operation, to also make the wedge member as a casting, and to drop-forge the friction shoes. The wedge and shoes could thus be made satisfactorily accurate, the flat or plain wedge faces being easily ground to remove any slight casting irregularities. In the case of the interior of the cylinder, however, machining would be both difficult and too expensive for practical consideration.

In friction devices of the character here involved, it is essential to desired efficiency that true full contact be had on all co-operating friction surfaces and also on the wedge faces. Due to the necessary foundry variations which must be permitted in commercial practice it was known that proper contact of all the sets of friction surfaces could not always positively be insured, and as a result thereof the devices did not function with the greatest efficiency.

Appellant's first device was completed and tested in July, 1934. On August 1, 1934, appellee notified appellant of the Brenne patent and of appellant's infringement of it. Thereupon, and before this action was instituted, appellant modified and discontinued its first device. As to the Brenne patent, therefore, appellant has no interest except for the decree for an accounting, which of course involves its validity and appellant's infringement thereof by its first device.

Following the order adopted by both parties we shall consider the Johnson patent first. Its objects are said to be: (1) To provide a simple expedient, not involving increased cost of manufacture, by which adjustments of the parts, within the limits of variations necessitated by commercial manufacture, can be had to positively insure the proper contact of all the co-operating engaging sets of faces; (2)

to provide means for insuring flat surface contact between the pressure-transmitting wedge and the co-operating faces of the shoes, while allowing for those variations necessitated by commercial practice; (3) to provide a process or method by which the contacting faces of the wedge and the shoes will be brought into true flat surface engagements with each other by a very few actuations after assembly, whereby the permitted foundry variations in commercial practice will be compensated for.

The patented mechanism is attached to the usual draft or center sills of a car under-frame, to the inner faces of which sills are secured front and rear stop lugs. The draw bar is operatively associated with a hooded cast yoke of well-known form, within which is disposed the patented mechanism with front and rear main followers. The mechanism proper is of that type which employs a substantially cylindrical shell and cage which is held in proper central position by guide plates secured to the draft sills, the yoke parts therein being supported in operative position by a detachable saddle. The shock absorbing mechanism comprises a combined friction shell and spring cage casting; a pressure transmitting wedge; three friction shoes; a spring resistance; a spring follower; and a retainer bolt. The shell and spring cage casting is of generally cylindrical form having the friction shell proper open at its front end. The rear of the casting constitutes the cylindrical spring cage, and at its rear the casting has an integral transverse wall bearing on the rear follower. The friction shell proper is preferably of the following formation: The interior of the shell, while of generally cylindrical contour, is preferably comprised of three true cylindrical surfaces, symmetrically arranged around the axis, and of approximately 120° extent each. These cylindrical surfaces are converged inwardly of the shell on a relatively slight taper and in such a manner that the inner ends of the three cylindrical surfaces merge into a true circle. With this arrangement, the friction shoes, which have cylindrical surfaces, will maintain true surface contact, as distinguished from line contact, with the shell at all positions during a compression stroke.

The wedge through which the pressure is transmitted is in the form of a hollow casting, having a front transverse bearing face engaging the front follower. At its inner end the wedge is provided with a true wedge face and two other rearwardly converging inclined faces, all of which are disposed around the center or axis of the wedge, so as to give the wedge the appearance of a truncated, somewhat irregular triangular, pyramid. The wedging surfaces of the friction shoes and the wedge are not all true wedge surfaces, there being one pair of such contacting surfaces more acute than the other two.

Two of the friction shoes, referred to as C and E, are alike, each having an outer friction surface which corresponds to a portion of a true cylindrical surface and which extends through an arc of approximately 120°. On the side nearest the axis of the shell each of the said shoes has a lateral enlargement on the front side of which is provided a rearwardly and inwardly inclined, longitudinally convex face, co-operating with one of the inclined faces of the wedge. The third shoe, referred to as D, is provided with a similar outer cylindrical friction surface, and on its inner side with an inwardly projecting enlargement having an inclined, longitudinally convex wedge face coacting with the other true wedge face. The faces of the shoes are so disposed that the front ends of the shoes will normally lie approximately flush with each other and project a short distance outside the end of the shell. The faces of the shoes are only slightly convex, being curved longitudinally on an arc of relatively great radius.

The spring resistance comprises an outer heavy coil, bearing at its inner end against the rear transverse wall, and an inner coil, bearing at its inner end upon a hollow cup-like boss formed integral with the rear transverse wall. The spring follower is more or less cup-shaped, having a heavy annular flange, the inner side of which is adapted to bear the front end of the outer coil. This spring follower has a forwardly extended integral cup, the interior of which provides a bearing for the front end of the inner coil.

The retainer bolt is anchored at its rear end within the cup-like boss above referred to, and its forward end within a recess in the front end of the wedge. This bolt not only serves to maintain the assembled parts, but is also used to adjust the parts to proper overall length, to thus maintain them when under full release, and to place the spring under initial compression to compensate for wear.

As the wedge is forced inwardly of the shell, there will be initially a slight movement of the wedge inwardly with respect to the keen angle shoe D due to the inertia of that shoe and the fact that, on account of the relatively keen angle, slippage of the faces is possible. During this initial action the two blunt angle shoes C and E will move longitudinally inwardly of the shell substantially in unison with the wedge, on account of the blunt relatively non-wedging angle of the co-operating faces, thus advancing the shoes longitudinally slightly ahead of the keen angle shoe. This initial movement sets up the desired pronounced spreading action. As the parts continue their movement inwardly of the shell, further slippage between the keen angle faces is substantially nil, but due to the taper of the shell surface, there must be a relative approach of the shoes which is permitted by the shoes C and E moving radially inward with respect to the wedge, the slippage occurring on the blunt angle faces which act as a sort of safety valve for this purpose. This differential action also advances shoes C and E longitudinally ahead of shoe D, and the action so continues until the end of the compression stroke. During the compression stroke and due to the advance of shoes C and E relative to shoe D, the spring cap or follower will be displaced from the inner end of shoe D. The contact existing between the ends of the two blunt angle shoes with the flange of the cap or follower is approximately 240°, being more than half of the circumference of the cap. With this arrangement, the shoes C and E advancing in unison, the spring cap is maintained in its proper position, which is at right angles to the axis of the mechanism, and without the possibility of the cap being tilted by the pressure of the spring.

While the spring cap is out of engagement with the inner end of the keen angle shoe during the compression stroke, nevertheless the keen angle shoe always affords resistance because of the friction between its friction surface and the shell surface, thus acting to retard the keen angle shoe with gradually increasing force always during the compression stroke. The friction shell being of metal, preferably of malleable iron, it is capable of a limited amount of radial expansion. With the taper of the shell the expansion can not neutralize the taper, and therefore a differential action is assured.

Upon removal of the actuating force, there is an initial releasing action induced by the lateral inward contraction of the shell. This produces a relative approach toward the central line of the mechanism of the three shoes, which in turn causes the wedge to be squeezed out from the shoes, which action is facilitated by the blunt angle faces on the wedge and blunt shoes respectively, the blunt angle faces now acting substantially as true wedge faces with respect to the radially inward contracting forces. The contraction of the shell continues until the shell has either resumed its normal condition or until the contracting forces have been reduced to a point where the stored up energy in the spring exceeds the longitudinal resistance to release the same. This initial action results in loosening the wedge sufficiently to permit the reduction of pressure between the friction surfaces of the shoes and the shell friction surfaces, whereupon the spring becomes effective to commence moving all of the friction elements outwardly of the shell. At the beginning of this outward movement the spring cap, or follower, will move the two blunt angle shoes in an outward direction, which in turn picks up the wedge sufficiently to loosen the keen angle wedge faces so that immediately thereafter the flange of the spring follower or cap will pick up the inner end of the keen angle shoe and move it longitudinally. This outward movement continues until the wedge is limited against further movement by the retainer bolt. The three shoes will then be forced to their normal position, and, on account of the extended area of contact between the two blunt angle shoes and the spring follower which maintains the latter perpendicular to the axis, all three shoes will be brought to rest with their inner ends flush.

In commercial practice a variation of two degrees in the taper of the shell friction surfaces is permitted. In carrying out the invention, the radius of curvature of the convex surface of the shoe is made of such length that it will accommodate variations within the two degrees just referred to, that is to say, assuming the maximum variation in one direction, contact will be insured between the curved surface of the shoe and the flat surface of the wedge near the inner ends thereof; assuming the variation in the opposite direction, contact will be assured between the same surfaces near their outer ends; a shell formed with

the friction surfaces tapered accurately as designed will insure contact at the centers of the curved surface of the shoe and the flat surface of the wedge; and variations intermediate the points referred to will insure contact between the limits mentioned.

When the parts are assembled there will be theoretically only a line contact between each set of surfaces of the convexed shoes and the wedge, but as soon as the device is compressed once this theoretical line of contact will immediately be widened into a surface contact of appreciable width and as two or three or four additional compressions occur, the area of contact is correspondingly increased until a sufficiently large area is obtained to insure a proper functioning of the parts. This can be accomplished in the usual test of the gear before being applied to the car.

Claim 1 of the Johnson patent is on a friction shock absorbing mechanism.[1] Claims 2, 3, 4 and 5 are on the process for insuring accurate fitting of the parts of such mechanism.[2]

---

[1] "1. In a friction shock absorbing mechanism, the combination with a friction shell having interior, longitudinally extending inwardly converging friction surfaces; of a spring resistance; a friction shoe cooperable with the friction surface of said shell, said shoe having, on its inner side, a face inclined inwardly and toward the center of the shell; and a member through which the actuating pressure is transmitted to said shoe and having a corresponding contacting face, one of said contacting faces being slightly convex, the curvature of said convex face being relatively small, whereby when the parts are initially assembled contact of relatively minute area is had between said faces to compensate for variations within predetermined limits, said convex face being flattened automatically upon actuations of the mechanism to thereby increase the area of contact of said surfaces and produce true contact therebetween."

[2] "2. The herein described process of insuring proper fitting of the parts of a friction mechanism which includes a member having slightly converging friction surfaces, friction shoe elements cooperable therewith, and an element through which the actuating pressure is transmitted to the shoes, which includes: manufacturing said member and elements independent of each other and providing on one of said elements an engaging surface slightly elevated at its central portion with respect to portions on opposite sides thereof; assembling said member and elements with the remaining parts of the mechanism and with said elevated portion in contact with the other element; and then compressing the mechanism a number of times thereby compressing said elements and effecting relative movement thereof to flatten out said elevated portion to provide a wider area of contact with the co-operating contacting element.

"3. The herein described process, insuring the accurate fitting of the parts of a friction shock absorbing mechanism comprising a friction shell having interior, inwardly converged friction surfaces; a spring resistance; a plurality of friction shoes cooperable with said surfaces and a pressure-transmitting wedge having contact with said shoes which includes: independently manufacturing said shell, spring resistance, shoes and wedge and initially providing one of each of the contacting sets of friction surfaces of the shoes and wedge with a convex contour, said surfaces of convex contour being of relatively small curvature; assembling the parts; and then successively compressing the mechanism to effect relative movement of said shoes and wedge to flatten down said convex surfaces to provide enlarged flat contacting areas between the shoes and wedge.

"4. The herein described process of insuring proper fitting of the parts of a friction shock absorbing mechanism, including the following steps: forming a friction member having a friction surface; forming a friction shoe element adapted to co-operate therewith; forming an element through which the actuating pressure is transmitted to the shoe; providing on one of said elements an engaging surface having an elevated portion; assembling said member and elements with the remaining parts of the mechanism and with said elevated portion in contact with the other element; and then compressing the mechanism a number of times to flatten out said elevated portion to provide a wider area of contact with the co-operating contacting element.

"5. The herein described process of insuring the accurate fitting of the parts of a friction shock absorbing mechanism and comprising the following steps: forming a friction shell with interior friction surfaces; forming a plurality of friction shoes with friction surfaces and wedge faces, the friction surfaces thereof being adapted to co-operate with said shell surfaces; forming a pressure-transmitting wedge with faces adapted to contact with said shoe faces; providing one of each of the co-acting sets of faces of the shoes and wedge with a protruding

To show lack of invention appellant relies principally on United States patent to O'Connor, No. 992,442, which expired in 1928. It contends that the patentable distinction claimed for Johnson is that the faces of his shoes are slightly convex, whereas O'Connor simply shows and claims his shoes as having convexly curved inclined faces. At the time O'Connor applied for his patent, appellee was producing a friction draft gear in which an anti-friction roll was placed between each shoe and the wedge. These rolls actually rolled only a very small amount. They provided a line contact between the wedge and the shoe and comprised a sensitive adjustment member which permitted immediate action in both compression and · release.

With the speeding up of service, heavier cars, and longer trains, demands upon draft gears increased. It was found that in some instances the anti-friction rolls were overloaded and they would at times either break or imbed in the other members of the friction clutch. This was the problem that then confronted both O'Connor and Johnson. O'Connor sought to substitute the line contact of a curved shoe against the wedge for the line contact of the anti-friction roll. He, therefore, disclosed the structure of a permanent crown on the shoe to provide a line contact, or one of limited area, throughout the life of the gear. At that time, and since, appellee owned this O'Connor patent. It was tested in appellee's laboratory and was found to be unsatisfactory because it was discovered that a crown on the shoe sufficient to provide a central bearing of limited area would dig into the wedge. For this reason the patent was never put in use.

It is quite true with respect to the convexity of the shoes that Johnson's claims read upon O'Connor No. 992,442; · they differ only in the degree of convexity, and O'Connor's claims on their face are not limited in this respect. It is likewise true that the mere carrying forward of the original thought with a change only in form, proportion or degree, in doing the same thing the same way by substantially the same means, but with better results, is not such invention as will sustain a patent. But where different concepts, purposes and objects are involved, as we understand the law, this rule is not always to be arbitrarily applied, and when different means are employed, followed by success where failure theretofore existed, there is no basis for the application of the rule.

The object of O'Connor's convexity was to provide a friction draft rigging of durable construction which would readily release, and afford a relatively high cushioning capacity. He proposed to accomplish this by convexly curving the faces of his friction shoes which engage the straight wedge faces, thus giving the wedge a central bearing of limited area against the friction shoes, which would cause the shoes to have an even bearing and pressure from end to end of the shoes against the friction shell, and would also serve to materially facilitate the release action of the friction mechanism. A reading of his claims in the light of his specifications is quite convincing of his intention to retain a permanent convexity of the shoe, and this conclusion is supported by the results of the tests of his mechanism.

Johnson's patent in suit does not provide a bearing of permanent limited area. He does initially employ that means in a very limited degree, and when the parts are first assembled there is a mere line contact between the shoe and the wedge. · Its purpose, however, is not to maintain a line contact, nor a limited area contact, but to produce a flat bearing. The slight temporary crown on the shoe is used as a means to secure a flat surface contact of the parts, regardless of the variations in the parts, and particularly in the taper of the interior surface of the shell. In forging the shoe a $\frac{2}{100}$ of an inch crown is placed on its inner wedging face. There is about $\frac{1}{16}$ of an inch relative movement between the faces of the wedge and the adjacent faces of the shoes. These parts do not wear. The pressure in the beginning, when there is practically a line contact, is so great that the metal in the crown is flattened and spread out and forced into the shoe, thus providing two flat surfaces working together. There are no filings or wearings, and none of the metal is lost. The flattening of the crown begins immediately and progresses as the device is used. When the device is assembled and before it is delivered to a railroad for use, it is tested under a 9,000 pound hammer, and given sufficient blows to increase the contact area

portion; assembling the parts; and then successively compressing the mechanism to flatten down said protruding portion to increase the area of surface contact of said last-named faces."

of the wedge and the shoe, and to insure its proper working. At the time the device leaves the plant there is about 25 or 30 percent contact area, which increases with service.

It is obvious that O'Connor sought to care for the permitted foundry variations of two degrees by a permanent convexity of the shoe which would form a permanent limited contact with the wedge. This is what he emphasized in his specifications, and the tests failed to accomplish the purpose. On the other hand, Johnson sought to accomplish the same purpose by the use of flat friction surfaces between the shoes and wedge, which flat surface of the shoe he accomplished by temporarily employing a slight, elongated convexity of the shoe which, by reason of the great force applied to it in the factory and afterwards in its normal operation, became flat and its area of contact extended.

It is argued by appellant that the O'Connor device would also flatten if put into service. This contention, however, is not supported by his disclosures nor is it borne out by the tests that were submitted. We think the evidence presented supports the conclusions that a crown on the shoe sufficient to take care of variations of about two degrees in the taper of the shell will flatten, and that a crown sufficient to provide a central bearing of limited area will not flatten but will imbed itself or dig into the wedge.

Appellant further contends that Johnson was not sufficiently particular as to the proper degree of curvature of the convexity, and that under his disclosures it must be arrived at by the trial and error method. We think this contention is not sound. Johnson suggests such curvature as will cause the wedge to contact the shoe near one end of the curved surface if the extreme variation is in that direction, and near the other end if the extreme variation is in that direction. Given, as here, the length of the wedging surface of the shoe together with the degree of variations to be accommodated, a curvature sufficient to accommodate such variations may be mathematically determined. The record discloses that the rise of Johnson's crown amounts to about .02 of an inch, which consists with the result of the calculation just referred to.

O'Connor, No. 992,442, together with his later patent, No. 1,093,879, and Courson, No. 1,256,297, were cited by the Patent Office, and they were held not to anticipate the patent in suit. This conclusion is substantially supported by appellant's expert witness, Busse, who said, "None of those three patents discloses the provision of a raised surface which is intended to be flattened during the operation of the device to secure an elongated bearing." With this statement we are in accord. It is unnecessary to particularize with respect to the latter two patents, for if O'Connor's first patent does not anticipate, it is clear that the others do not.

Appellant further relies on United States patent to Harrison, No. 345,232, which relates to bearing-brass for car-axle journals; and to Kelsoe, No. 1,404,860, which relates to a coupler and yoke connection for draft appliances of railway cars for the purpose of permitting the coupler to have lateral and vertical swinging movements with respect to the yoke. From a study of these patents we are convinced that the arts there involved are not analogous to that of the patent in suit. See A. J. Deer Co. v. U. S. Slicing Machine Co. (C.C.A.) 21 F.2d 812. The same may be said concerning the testimony of Busse with respect to brake shoes. Aside from the question of analogous arts, however, we are constrained to believe that Johnson's concept was new, and that so far as this record shows, it was never disclosed by any prior art, analogous or otherwise. Whatever may be said as to the ability of those skilled in the art to readily grasp Johnson's concept from past disclosures in any art, the fact remains that after many years of experimentation no one suggested it prior to Johnson's disclosure in the draft gear field. It comes to us with the approval of the Patent Office, with the presumption of validity which that approval bears. This conclusion is supported by the findings and conclusions of the District Court, together with a commercial success which can not be ignored. Of course, commercial success alone will not sustain a patent, but in this case it does not stand alone as proof of validity. See Temco Elec. Motor Co. v. Apco Mfg. Co., 275 U.S. 319, 48 S.Ct. 170, 72 L.Ed. 298.

Appellant calls attention to the fact that appellee's commercially successful friction gear is marked as made not only under the patent in suit, but also under three other patents belonging to appellee, viz: O'Connor, 1,497,935; Miner, 1,780,358; and Johnson, 1,931,395. It, therefore, con-

tends that the commercial success is due rather to the features of the last three named patents than to the patent in suit. A perusal of the record convinces us that this contention is contrary to the weight of the evidence. It is true that claim 1 discloses a combination which includes features of all these patents, yet, we think Johnson's concept of a slightly convexed shoe friction face, as disclosed in the patent in suit, is the thing that produced the successful result. His application for the patent antedates by several years the applications for his second patent and that of Miner, and followed the second O'Connor patent only by a few months. It was manufactured by appellee at least as early as 1929, and was used for many years on every draft gear device manufactured by appellee.

Claims 2 to 5, inclusive, are process claims, and here for the first time, without assigning error thereon, appellant contends that they do not describe a patentable process; that they cover nothing but the intended actuation of the mechanism described in claim 1; and that the process cannot be performed except by that mechanism. This contention is based on the well-known rule that where one has invented a machine for completely carrying out a process, the machine only, and not the process is patentable. A reading of these claims makes it quite obvious that the shock absorber alone could not possibly perform the several steps of the process. We think this contention is both untimely and unfounded.

On the question of infringement of claim 1, we think there can be no doubt that the accused structure does infringe. With perhaps one exception, the description of appellant's device, by its own expert, clearly reads upon that claim. The exception, if true, is a vital one. Appellant insists, and its expert so testified, that its shoes, five in number, were manufactured without crown or convexity. This expert for some time had been continuously engaged in designing and developing appellant's device. His attention was directed to the fact that the wedging faces of the shoes taken from the physical exhibit of appellant's device were slightly crowned. Without denying that fact he said: "That irregularity is due to wear of the dies or possibly heat-treatment; principally I will say the wear of the dies." He further stated that there was no intentional provision of a convexity or a bulging portion, either on the wedge face or the shoe. The trial court, by its application of a straight edge, found longitudinal convexity in each of the five shoes of the same gear, but found no transverse convexity. It thereupon concluded that such convexity did not occur by chance but that it was intentional. From our examination of the same exhibits we have arrived at the same conclusion, and we are further convinced from the record that such convexity is essential to the desired results of both parties.

With respect to the process claims it may be repeated that appellee tests each of its gears before sending it to the purchaser, by means of which the convexity is progressively flattened. The appellant makes no such test, in other words, at the time appellant delivers its gears to the purchaser the final step in each of the process claims has not been taken. It does this with the knowledge that the railroads will put them to use and thereby flatten the crown, thus completing the final step of the process. In this the District Court found appellant guilty of contributory infringement of each of the process claims, and we think that finding is correct.

Claim 1 of the Brenne patent [3] likewise comes to us with the presumption of validity. The object of the invention is to provide a friction shock absorbing mechanism of that type characterized by a wedging means having keen angle effect in compression and blunt angle effect in release, wherein means are employed to insure proper contact with all coacting wedge faces. The specific object is to provide such mechanism wherein a cylindrical shell is employed with a circularly arranged series of shoes, and a wedge co-operable therewith in combination with means between the wedge

[3] "1. In a friction shock absorbing mechanism, the combination with a friction shell having interior friction surfaces; of a spring resistance; a plurality of friction elements cooperable with said shell; a pressure-transmitting element extending between said friction elements; and means, interposed between said friction elements and the pressure-transmitting element, said means having wedge face engagement with one of said elements and adjustable spherical bearing face engagement with an opposed element."

and shoes, automatically insuring proper and effective action of the wedge during a compression stroke.

The mechanism proper comprises a combined friction shell and spring cage, a spring resistance, two like friction shoes, a third friction shoe, a pressure-transmitting wedge, two like wedge elements, a third corresponding element, a spring follower, and a retainer bolt.

Each of the shoes on its wedge facing is provided with a concave depression in which is placed a wedge-like element of spherical face adapted to fit within the concave face of the adjacent shoe, and a straight bearing face adapted to contact the wedge. It is pointed out that the wedge-like elements are adapted to adjust the members in order to compensate for variations which may occur in the angles between the faces of the pressure wedge or in the angles which any one of the faces of that wedge may make with respect to the axis of the mechanism. It is said that this arrangement insures true and full surface contact of the pressure wedge and the wedge elements, and will care for any tilting or skewing of the pressure wedge, which may occur by reason of an eccentric blow being delivered to the mechanism.

The Patent Office cited Courson, No. 1,-225,111 and Johnson, No. 1,255,172, but they were considered not to anticipate. We understand from appellant's brief that it does not disagree with this ruling. In its original device, which it ceased to manufacture upon appellee's notice of infringement, the pressure-transmitting wedge directly engaged the friction shoes, and there were no elements corresponding to what Brenne referred to as wedge elements. It is therefore contended by appellant that, in order to extend Brenne's claim 1 to read on appellant's original device, appellee is compelled to and does consider any spherical adjustable element in the transmitting member as the equivalent of Brenne's so-called wedge elements. If, therefore, Brenne's claim is interpreted so broadly as to apply to appellant's first device, appellant contends that the claim is too broad to involve invention over Tower, No. 914,-089, Newell, No. 1,232,595, and Johnson, No. 1,255,172. We think the references are inapplicable. In Tower no friction shock absorber is involved, and there is disclosed no friction shell, wedge, shoes, or adjust-

ing member. Newell shows a double wedge and double and opposed shoes and an entirely different operation from that of Brenne. He does not disclose adjustable means between the friction elements and the pressure-transmitting element. Appellant contends that his pressure-transmitting means, which is the ball-faced wedge follower, is found in Newell. It is quite true that Newell has a ball-faced spring follower which engages the wedge, not as a pressure-transmitting element, however, but as a pressure-receiving element. It seems clear that the ball-face in Newell is not the same as in Brenne and in appellant's first device, which is an angular adjustment or skewing of the coupler with respect to the elements of the friction gear.

Johnson, No. 1,372,698, provides for rollers between the wedge and shoes, but they do not provide for adjustment or skewing of the coupler as in Brenne. The only members having a spherical contact in the Johnson patent are the two sections of the spring follower, which as in Newell do not function as the spherical faces in Brenne and in appellant's first device.

■ We think that claim 1 of the Brenne patent is valid and infringed by appellant's first device. We are further of opinion that all claims of the Johnson patent are valid and infringed by both of appellant's devices.

Decree affirmed.

### On Petition for Rehearing.

■ On petition for rehearing appellant points out that our opinion is capable of the construction that we intended thereby to foreclose appellant from utilizing the prior art disclosed, and it requests that we express our intention to the contrary. This we do gladly. We disclaim any intention of holding, or power to hold, that the patent in suit could be infringed by the practice of any prior art. If appellant is now making a structure in which convexity is not essential to the desired result, obviously the question of whether such new product infringes is not now before this court.

■ Appellant further urges for the first time that claims 4 and 5 of the Johnson patent are lacking a required supplemental oath. If true, the objection comes too late. Other objections raised we think were fully covered in the opinion.

Petition for rehearing overruled.