Seth EVANS, Plaintiff,

v.

Robert C. WATSON, Commissioner of Patents, Defendant.

Civ. A. No. 256–54.

United States District Court
District of Columbia.

June 21, 1956.

226

George R. Jones, Irving M. Tuller, of Beale & Jones, Washington, D. C., Ray L. Smith, Houston, Tex., of counsel, for plaintiff.

C. W. Moore, Sol., U. S. Patent Office, Washington, D. C., S. W. Cochran, Washington, D. C., of counsel, for defendant.

WILKIN, District Judge.

Plaintiff, under 35 U.S.C. § 145, seeks judgment for letters patent on three claims, 1, 5 and 8 of application Serial No. 27,247, filed May 15, 1948, for an article designated a "Threaded Connection." The article is a connection for joining, end-to-end, drill collars and drill pipe to make up a drill stem of an oil well rotary drilling apparatus. Pl. Brief, p. 6.

The essential feature of the plaintiff's tool joint consists of employing a screw thread in which the angle between the

two adjacent sloping sides of each screw thread is approximately 90 degrees, instead of the 60-degree crest angle in prior use. Plaintiff's tool joint, when connected or "made-up," affords a high compressive strength between the abutting shoulders of the pin and box members. The important feature of plaintiff's connection is the elastic deformation or "swelling" of the walls of the pin and box members which is produced by the 90-degree crest angle of the threads.

The Board of Appeals of the Patent Office in denying the plaintiff's application said:

"We agree with the Examiner that there is nothing of patentable merit in the mere substitution of the well-known 90-degree thread for the standard 60-degree thread of the prior art."

The Patent Office tribunals admitted, however, that plaintiff's threaded connection is superior to the conventional connections, and that no prior patent or publication shows a screw thread having a 90-degree crest angle employed in oil well drilling equipment. Novelty and utility being admitted, and no contention being made that plaintiff is barred by Section 102 of Title 35, U.S.C., plaintiff's application was denied on the sole ground that he was barred by Section 103 of Title 35; that is, because "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art."

At the end of the trial, the Court stated a definite impression that the change of the angle of the thread could hardly be invention; that threads of 90-degree angle had been made for other purposes; that such change was only a change in degree; but from the evidence it was quite clear that the change had produced a remarkable improvement; that the drilling operations with the 90-degree connections, especially in the hard-rock formations, were much more successful and less expensive; that the number of failures in the drilling string had been decreased to a remarkable degree. The Court then stated that if a patent was warranted, it would be because of the discovery of the effect, rather than because of the mechanical change; the change was simple, but the effect was striking and produced unexpected improvement; that the need for such improvement, especially in the deeper operations, had been recognized for many years, and various attempts to meet the need had been made without success; that the applicant's experiments were conducted at great expense, but were immediately crowned with success; and that the applicant's connection has been adopted quite generally. The Court then stated that the sole issue seemed to be whether or not the discovery of the usefulness of the change warranted a patent monopoly, and counsel agreed that such was the real issue. R. 183.

It is, therefore, apparent that this case presents the issue of patentability in a most acute form. There is no dispute as to what the facts are; there is no dispute as to what the law says. The controversy arises over the question, Does the law which authorizes patent monopolies, considered in the light of its history, theory and purpose, warrant the grant of a patent in this case? Or, in other words, What is the effect of the established law on the established facts?

The decisions of the Patent Office are always given respectful consideration, but it seems clear that this case is not subject to the presumption in favor of the judgment of the Patent Office. That presumption is based on the deference which judges of law courts entertain for the more extensive learning and experience of officers of the Patent Office in technical science. This case, however, exemplifies the basic reason for the "remedy by civil action" allowed by Section 145. It is the intent of that Section to keep the administration of the Patent Law from becoming too

technical; to conserve the original purpose of the law.

 The undisputed evidence before this Court reveals that the work done by plaintiff led directly to a discovery that promotes the progress of science,[1] to a new and useful improvement in manufacture[2] of the threaded connection in an oil well drill stem. The Patent Act, as well as the Constitution, mentions both invention and discovery; but the decisions for the most part deal with invention. They are not the same. Dennis v. Pitner, 7 Cir., 106 F.2d 142 (3). Invention is something definitely sought or created and usually predictable. Discovery is something found or learned unexpectedly; it is unpredictable. Some accomplishments have elements of both invention and discovery. And the Patent Law and decisions seem to impose one condition on both—they must have been brought into existence by prior effort to merit the reward of patent monopoly. The purpose of the Patent Law is to encourage diligence, skill and initiative that "promote the progress of science and useful arts." While there may be an element of luck in both invention and discovery, legislative history and the trend of patent decisions would hardly warrant the grant of a patent for a discovery entirely fortuitous. Morton v. New York Eye Infirmary, 17 Fed.Cas. p. 879, No. 9,865, 5 Blatchf. 116. As Walker says:

"It is only when the discoverer has gone beyond the mere domain of discovery, and has laid hold of the new principle, force or law and connected it with some particular medium or mechanical contrivance by which, or through which, it acts upon the material world, that he can secure the exclusive control of it through the Patent Act." Walker on Patents, 1 Deller's Edition 37.

But the evidence in this case reveals that the plaintiff expended a great deal of effort and money to accomplish the desired result. Furthermore, he embodied his discovery in a particular medium or mechanical contrivance by which, or through which, it acts. During the last World War, the great need for oil occasioned extensive drilling in West Texas and other hard-rock areas. The oil wells in such territories were drilled to depths of eight or nine thousand feet, and much of the distance was through a geological formation of very hard rock. These conditions occasioned an increase in the failures in the drilling stem connections. The breaks in the drilling stem and the interruptions occasioned by wear and tear on the drill collars made the expense in time and bits almost prohibitive. The oil companies, the drillers, and the manufacturers of drilling machinery all recognized that unless something could be done "to improve the rate of penetration and the footage by bit," operations in the territory would have to be abandoned.

Extensive experiments were made. They involved treatment of the metal with the hope of increasing its tensile strength, the use of lubricants, and other measures. None of the experiments met the need. The problem was so serious that the American Petroleum Institute became interested, and its Subcommittee on Drill Collars undertook a study and course of experimentation. The Committee in turn referred the problem to the Batell Memorial Institute of Columbus, Ohio, for a photo-elastic analysis and recommendations. Nothing constructive was accomplished.

The plaintiff, Evans, suggested to his employer, The Hughes Tool Company, that the problem be approached by trying a designed change rather than by continuing surface treatments and lubricants. His suggestion was that a change in the crest angle of the thread from 60 to 90 degrees would put into the connection "a greater resilient stored energy." It was quite generally believed that such a change in the crest angle of the thread would increase the "elastic swell" in the pin and box of the coupling, and it was

1. U. S. Constitution, Article I, Sec. 8.

2. 35 U.S.C. § 101.

feared that such "swell" would increase the failures.[3]

The witness, Payne, an officer of the Hughes Company, testified:

"We knew we had to field test it. There was no other way we could determine whether it would be successful in accomplishing this needed goal of preventing loosening of joints in the presence of these forces that tended to loosen the screw connection."

Fifteen new connections were manufactured with a 90-degree crest angle, and were given a field test by the Carl B. King Drilling Company under the supervision of their drilling engineers. The new connections proved successful in the hardrock field. Ninety-degree connections were then made in other sizes for drill stems of greater diameter, and they too were quite successful. Experiments were then made with 60-degree pins and 90-degree pins in the same drilling operation, in order that a comparison of strength could be made under similar conditions. During a drilling period of 5,100 hours, there was a failure of fifteen of the 60-degree pins and a failure of only two of the 90-degree pins. As a result of such tests, there followed a very general acceptance and commercial use of the 90-degree connections.

The case seems to fall within the principles announced in: Loom Co. v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177; Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523; Peerless Equipment Co. v. W. H. Miner, Inc., 7 Cir., 93 F.2d 98; Ingersoll Milling Mach. Co. v. General Motors Corp., 7 Cir., 207 F.2d 42; L-O-F Glass Fibers Co. v. Watson, D. C. Cir., 228 F.2d 40; Kelley v. Coe, 69 App. D.C. 202, 99 F.2d 435(7).

■ Patent grants issued to the plaintiff by foreign countries were offered in evidence and objected to by counsel for the defendant. To make the foreign patents competent evidence of patentability, plaintiff would have to show substantial identity of the foreign patent law with the law of this country and substantial identity of the facts of the pending application with the facts upon which the foreign tribunal based its decision. Testimony as to foreign patents was received, however, merely as cumulative evidence of the acceptability and general use of the plaintiff's 90-degree connection. Wach v. Coe, 64 App.D.C. 235, 77 F.2d 113, 115.

■ The evidence was clear and convincing that the case met the requirements and was within the purview of the Patent Law; and that while the mechanical change was obvious, the effect was not.

It is the judgment of this Court that the plaintiff, in view of his initiative, patience, diligence, and expenditure, and his contribution to the benefit of the oil industry, is entitled to the grant of a patent.

Counsel for plaintiff may prepare findings of fact, conclusions of law, and a final order.

3. Such elastic deformation or "swelling" was advanced as the opinion of the experts. If a gratuitous opinion by the Court in a matter so technical were justified, it might be suggested that the virtue of the 90-degree angle thread may be occasioned by diminishing the acute-angular or diagonal pressure upon the thread and directing the pressure of the vertical stem against a more nearly horizontal opposing face.