**CALMAR, INCORPORATED, Appellant,**

v.

**COOK CHEMICAL COMPANY,**
**Appellee.**

**COLGATE-PALMOLIVE COMPANY,**
**Appellant,**

v.

**COOK CHEMICAL COMPANY,**
**Appellee.**

**Nos. 17540, 17541.**

United States Court of Appeals
Eighth Circuit.

Aug. 21, 1964.

Rehearing Denied Oct. 9, 1964.

Robert F. Conrad of Watson, Cole, Grindle & Watson, Washington, D. C.,

2. Billeci v. United States, 9 Cir., 298 F.2d 703, 706. See, also, Rawson v. Calmar S.S. Corp., 9 Cir., 304 F.2d 202, 205.

made argument for appellants, Calmar, Inc., and Colgate-Palmolive Co. Francis G. Cole and Raymond P. DeMember of Watson, Cole, Grindle & Watson, Washington, D. C., and James P. Burns, Washington, D. C., of counsel, were with him on the brief for Calmar, Inc.; together with Howard A. Crawford, and Jack W. R. Headley of Lathrop, Righter, Gordon & Parker, Kansas City, Mo., and George H. Mortimer, New York City, of counsel, for Colgate-Palmolive Co.; and William H. Curtis, Kansas City, Mo., also for appellant Calmar, Inc.

Gordon D. Schmidt of Hovey, Schmidt, Johnson & Hovey, Kansas City, Mo., made argument for appellee and was on the brief with George T. Morton, Jr., of Watson, Ess, Marshall & Enggas, Kansas City, Mo.

Before VAN OOSTERHOUT, RIDGE and MEHAFFY, Circuit Judges.

MEHAFFY, Circuit Judge.

Appellants, Calmar, Incorporated and Colgate-Palmolive Company, brought separate actions for declaratory judgment against appellee, Cook Chemical Company, seeking a ruling of invalidity and noninfringement of United States Patent No. 2,870,943 filed on March 4, 1957 and issued on January 27, 1959 to inventor Baxter I. Scoggin, Jr. Cook had acquired ownership of the patent and counterclaimed alleging its validity, infringement by both appellants and unfair competition on the part of Colgate. All actions were consolidated for trial, but hearing on the unfair competition charge against Colgate was deferred pending the outcome of the issues of validity and infringement. Jurisdiction and existence of a justiciable controversy obtain. The District Court in an opinion published in 220 F.Supp. 414 found the patent valid and infringed, and we affirm.

The Scoggin patent in issue will be referred to as Cook-Bakan 2 and the accused device as Calmar SS–40. The undisputed factual background may be briefly recounted. Cook has been in the household insecticide business since 1945.

Until 1947 Cook utilized metal sprayers as a dispenser for its product, trademarked "Real Kill", but in that year it first purchased newly developed plastic sprayers from Calmar as a sales promotion gimmick and attached them to the outside of its bottles of insecticide with a separate holder. Successful sales reaction to the idea necessitated its continued practice. Prior to 1956 Cook purchased its sprays from Calmar, but thereafter manufactured its own sprayers through a subsidiary, Bakan Plastics Company. In 1954 Colgate-Palmolive entered the household insecticide field with an aerosol container labeled "Kan Kill". In 1958 Colgate was marketing its "Kan Kill" in liquid, as well as aerosol, form, using a Calmar sprayer attached separately to a glass container. the combination of which resembled Cook's bottle of liquid "Real Kill" with accompanying Bakan sprayer. Marketing of both manufacturers' products with separately attached plastic sprayers posed extra handling and expense problems. The bottler had to affix the cardboard or plastic holder on the neck of the bottle and insert therein the sprayer. More vexatious were the problems of breakage of the flimsily secured sprayer during shipment and pilfering while on the retailer's shelf. With the advance of the pressurized aerosol container, competition became acute due to the convenient shipment and use of the aerated sprayer, which required only that the housewife remove the sprayer cap and depress a button releasing the gasified insecticide. The liquid insecticide makers were aware of their product's shipping and operation shortcomings, and plagued by the apparent need for a container with an integrated sprayer-pump which could be safely shipped without breakage or leakage. Despite the extensive research and experimentation given the problem by Calmar, Cook and others for a period of some ten years, no solution was forthcoming until conception and commercialization of the Cook-Bakan 2, described by its inventor as a "Pump-Type Liquid Sprayer Having Hold-Down cap".

The sprayer pump, although not the patentable device in suit, has as its upper element, a head containing an orifice, connected with an internal pump through which a dip tube extends to the liquid in the container below. When the sprayer head is depressed, the pump is actuated and causes the liquid in spray form to be emitted.

It was a simple matter to incorporate the sprayer in the container rather than employ the ordinary non-perforated cap with sprayer separately attached, but such an arrangement did not lend itself to shipping because the sprayer would accidentally pump the liquid out in transit. The sprayer head had to be combined and shielded with some type of overcap which maintained the plunger in a depressed position minimizing leakage from the pump of the low viscous insecticide or other similar liquids, while retaining any such leakage within the overcap through a liquid-tight seal until the cap was removed and the product put into use by the consumer.

Scoggin described his answer to these liquid manufacturers' dilemma in the specifications of his patent application as an invention relating to "improvements in structures for dispensing liquids wherein is provided a spray-type hand pump mounted within a container for the liquid through use of the closure cap of such container". Of the four claims on which the Patent Office granted the patent, we are concerned only with Claims 1 and 2.[1]

The object of the patent is to eliminate the old outside attached sprayer and supplant it with a sprayer enclosed in the container in such a fashion that the sprayer head will be depressed, protected, and sealed in order that the product would lend itself to transportation and handling without breakage or leakage. Claim 1 described a completely integrated device which assertedly accomplished this purpose by the assemblage of corresponding internal threads in the over-cap which screw onto corresponding external threads of the sprayer head's collar with an allowance for a space between the lower edge of the over-cap and the container cap to insure a torqued fit. The overcap, while holding the sprayer head de-

1. Claim 1. "In a closure assembly for an open-top container having a perforated cap over said open top thereof mounting a spray unit including a barrel provided with a tubular extension passing coaxially upwardly through the perforation in said cap, a plunger reciprocally carried by the barrel and normally extending therebeyond and a spray head on the upper end of the plunger above said extension, the combination with said spray unit of an annular retainer telescoped over and secured to the extension above said cap and provided with external, circumferentially disposed screw threads and an annular, continuous segment at the upper part of the retainer above said screw threads, and a cup-shaped hold-down member housing the head and holding the plunger depressed at substantially the innermost path of travel thereof within the barrel, said member being provided with internal screw threads complementally engaging said screw threads on the retainer and having an internal, circumferentially extending, continuous shoulder disposed to engage said segment around the entire periphery thereof and there-

by present a liquid-tight seal located between the spray head and said threads on the retainer and said member respectively, said shoulder being spaced from the lower annular peripheral edge of the member a distance at least slightly less than the distance from the portion of said segment normally engaged by said shoulder, to the proximal upper surface of the cap whereby said lower edge of the member is maintained out of contacting relationship with the cap when the member is on the retainer in a position with said shoulder in tight sealing engagement with the segment."

Claim 2. "A closure assembly as set forth in claim 1 wherein one of the normally interengaged surfaces of the shoulder and segment respectively is substantially conical to present an inclined annular face coaxial with the member and said retainer and of sufficient diameter at the largest end thereof to cause the seal effected between the shoulder and said segment to become tighter as the shoulder slides on said segment during shifting of the member toward the cap."

pressed, also provides for a seal resulting from a raised annular rib around the top of the collar engaging the periphery of three surfaces formed by a downwardly facing shoulder on the underside of the over-cap above the threads. An expert testifying on behalf of appellee described the device's novel contribution to the industry as:

"The first commercially successful, inexpensive integrated shipping closure pump unit which permitted automated assembly with a container of household insecticide or similar liquids to produce a practical, ready-to-use package which could be shipped without external leakage and which was so organized that the pump unit with its hold-down cap could be itself assembled and sealed and then later assembled and sealed on the container without breaking the first seal."

■ *Validity of the Patent.* The statute provides that a patent shall be presumed valid and the burden of establishing invalidity rests on the party asserting it. 35 U.S.C.A. § 282. The issue of patentability of a new combination of old elements to form invention must, however, be approached keeping in mind the more exacting standard long required by the Supreme Court. In Selmix Dispensers, Inc. v. Multiplex Faucet Co., Inc., 277 F.2d 884 (8th Cir. 1960), we recognized the Supreme Court's admonition in Great Atlantic and Pacific Tea Co. v. Super-Market Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950) that "The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable." See also Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 90, 62 S.Ct. 37, 86 L.Ed. 58 (1941); Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008 (1938); Caldwell v. Kirk Mfg. Co., 269 F.2d 506 (8th Cir. 1959), cert. denied 361 U.S. 915, 80 S.Ct.

260, 4 L.Ed.2d 185 (1959); Briggs & Stratton Corp. v. Clinton Machine Co., Inc., 247 F.2d 397 (8th Cir. 1957), cert. denied 355 U.S. 914, 78 S.Ct. 344, 2 L.Ed. 2d 274 (1958).

Factual comparison of the individual elements of the Cook-Bakan 2 sprayer unit with prior art would permit a finding that its components are not novel per se—threaded over-cap depressing sprayer head (Lohse Pat. No. 2,119,884); complementary threaded collar (Lohse Pat. No. 2,119,884; Darley Pat. No. 1,447,-712); space tolerance between over-cap and container cap (Slade Pat. No. 2,844,-290; Livingston Pat. No. 2,715,480); and shoulder-rib seal at zone beneath sprayer head and above threads (Mellon Pat. No. 2,586,687). However, there is nothing in the prior art suggesting Scoggin's unique combination of these old features in such an assemblage as would solve the production, shipping, and operation problems which for years beset the insecticide industry as well as producers of other low viscous liquids. The patentee's "closure assembly" eliminated the costly and time consuming steps in production requiring attachment of the sprayer holder to the outside of the container and insertion of the sprayer, while at the same time providing a protected, sealed sprayer unit which need only be screwed onto the top of the insecticide container like a metal cap, not to be disturbed until removal of the over-cap and application by the ultimate consumer. This novel "marriage" of the sprayer with the insecticide container which took years in the discovery is neither taught by, nor readily discernible from the application of mechanical skill to the elements of the prior art.

■ Not only did the device produce new and useful results in the more efficient and economical bottling of low viscous liquids while simultaneously eliminating breakage and leakage during its shipment and storage, but it enjoyed immediate commercial success from the public. Cook used on its own products or sold to customers some fifteen million of

the Cook-Bakan 2 sprayers receiving not over one hundred complaints which is negligible when dealing with an item packaged by mass production techniques. Evidence of commercial success in a doubtful case may turn the scale in favor of the patentee. Long v. Arkansas Foundry Co., 247 F.2d 366, 369 (8th Cir. 1957). Instantaneous industry, as well as public acceptance of the device in issue, confirms our belief invention was produced.

■ In short, the Cook-Bakan 2 meets the exacting standard required for a combination of old elements to rise to the level of patentable invention by fulfilling the long-felt need with an economical, efficient, utilitarian apparatus which achieved novel results and immediate commercial success. Unquestionably, the trial court's finding something new was created worthy of patent protection was proper.

*Infringement.* After the Cook-Bakan 2 was marketed, some of Calmar's larger customers solicited it to produce a leak-proof, integrated sprayer. At that time Calmar was distributing an uncovered, lock-down bayonet slot type sprayer, the S–25–LP, which proved so unsatisfactory in retaining products of the liquidity of insecticides that one of Calmar's officials discouraged promotion of the item by its sales force. Calmar also experimented with a polyethylene boot, resembling an elongated balloon, which was inserted in the container and covered the lower extremity of the sprayer pump to prevent leakage. Colgate, a customer of Calmar, rejected this innovation and expressed preference for something similar to the Cook-Bakan 2 in appearance which would provide an internally leak-proof sprayer in addition to a shipping enclosure for the sprayer head. Calmar was notified by another customer that it had a Cook-Bakan 2 on test which had proven not to leak. During the fall of 1957 continued pressure from other customers beleaguering Calmar to produce a truly leak-proof integrated sprayer prompted Calmar's president to employ engineer Douglas F. Corsette in December of 1957, assigning him the special mission of designing such a sprayer which would satisfy customer demands and recapture market initiative.

On September 9, 1958, subsequent to commercialization of the Cook-Bakan 2 in 1957, application was made for a patent on the accused device, Calmar SS–40. Production and distribution of the accused device immediately followed Calmar's grant of United States Patent No. 2,956,509 on October 18, 1960.

■ The challenged features of the alleged infringing Calmar SS–40, the combination of collar to cap seal with attendant hold-down of the sprayer head, are identical with respect to the sealing zone, principle, and purpose of the Cook-Bakan 2 and differs only in the shape or form of the sealing surfaces at the collar to cap engagement.[2] The trial court correctly described this uncontrolling difference in shape of the seal as the employment of a square shoulder-to-rib type seal on the Cook-Bakan 2 opposed to a tongue-and-groove or "labyrinth" seal on the accused device. The Cook-Bakan 2 provides for three contacting sealing surfaces, whereas the tongue-and-groove shape of the Calmar SS–40 provides for four contacting surfaces. The practical effect of the accused device was to perform substantially the same function in substantially the same manner to obtain the same result as the patent in issue. Exercising our appellate prerogative in a patent case to interpret the exhibits for ourselves, we are constrained to agree with the trial court's statement that "Upon close inspection of the devices, it is difficult to see how they could be much more similar and yet have any different features".

■ Appellants assert error on the part of the trial court in basing its con-

---

2. The accused device also utilized "inner seals" in the pump mechanism uninvolved in this litigation.

clusion of infringement on comparison of the devices rather than comparing the accused device with the claims of the patent·in suit which they maintain bespeak dissimilarity. The record, however, affords specific evidence of the similarity of the accused device with elements described in Claims 1 and 2 of the Cook-Bakan 2 patent. Testifying at length concerning the elements and patent claims of both devices, a highly qualified expert witness for appellee stated that it was his opinion each and every one of the mechanical elements outlined in Claims 1 and 2 of the Cook-Bakan 2 finds a response in the structure of the accused Calmar SS–40 sprayer unit. The Supreme Court held in Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 50 S.Ct. 9, 74 L.Ed. 147 (1929) that generally one device is an infringement of another if it performs substantially the same function in substantially the same way to obtain the same result even though they differ in name, form, or shape. See also Graver Tank Mfg. Co., Inc. v. Linde Air Products Co., 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); Priebe & Sons Co. v. Hunt, 188 F.2d 880, 883–884 (8th Cir. 1951), petition for cert. dismissed 342 U.S. 801, 72 S.Ct. 92, 96 L.Ed. 607 (1951). The accused device falls within this definition prohibiting substantial equivalence since its basic mechanical elements, mode of operation, and results obtained find an identical counterpart described in the pertinent claims of the Cook-Bakan 2, the two devices varying only with respect to the inconsequential shape of the sealing surfaces.

The finding of infringement in the instant case based on the doctrine of substantial equivalence is a factual determination. Graver Tank Mfg. Co., Inc. v. Linde Air Products Co., 339 U.S. supra at 609, 70 S.Ct. 854; Maytag Co. v. Murray Corp. of America, 318 F.2d 79, 83 (6th Cir. 1963). Substantial evidence supports the trial court's finding of infringement.

The judgment of the District Court is in all things affirmed.